Ms. Gilden? Thank you, Judge. May it please the Court, my name is Carol Gilden. I'm from Cone Mill Steam Cellars in Toll, and I represent the lead plaintiff's appellants in this action. I would like to reserve, with your Honor's permission, three minutes for rebuttal. This is an appeal from a dismissal of a plaintiff's securities class action on a motion to dismiss. This case involves an unprofitable software tech startup company called Pluralsight and its CEO and CFO, Aaron Sconard and James Budge, respectively, who misrepresented a critical area of the company's operations to investors during the first half of 2019. Specifically, they misrepresented, among other things, the size and the expansion of the company's sales force. This ultimately drove up the price of the stock during the class period from just about $19 shortly before the start of the class period to over $29 a share. During this time, Mr. Sconard and Mr. Budge engaged in insider sales, making over $37 million. Part of these sales, and this is relevant, took place through a $456 million secondary offering that they engineered. When they could conceal the shortfall in sales reps no longer and had to come clean to investors reporting the impact of this major shortfall on Pluralsight's billings in the second quarter, the price of the stock plummeted 39.52%. Counsel, the billings growth were on track in the first quarter of 2019. Isn't that correct? That's correct, Your Honor, but the billings would be on track because the billings represented sales that were made five to six months earlier. What's critical here is the time lag, and it's called the pipeline. There's basically about a five to six month lag between when you have sales reps out there making the sales and dealing with companies and when they show up in billings, and that's part of the model. And is that pipeline theory alleged in the corrected amended complaint? Excuse me, Your Honor? Is that pipeline theory of the delay in the manifestation of the problem, is that alleged in the corrected amended complaint? Yes, it is, Your Honor. We have set forth what the metrics were, the pipelines. We have set forth what the CEO and CFO monitored in real time so that they knew when they were off and they were telling investors that we have 250 sales reps, and in fact, at the start of the class period, they had 200. They knew because of all the tracking that this company did and how embedded they were in monitoring the process that the shortfall in billings would not show up until late in the second quarter. Does the corrected amended complaint allege the precise method by which they did this monitoring, and that is with documents they looked at or anything, or do you just allege that generally? No. To answer your question, Your Honor, what the corrected amended complaint alleges is it alleges statements that Mr. Scottert and Mr. Budge made to investors and to analysts when they talked about the monitoring that they did, when they talked about the metrics, when they talked about the ramping, which of course evidences familiarity. After all, if you are the CEO of a company and you are a CFO of a company, you can't talk about that which you don't know. You have to have a basis. So we have set forth in the corrected amended complaint all the statements that they made to investors, to the market, evidencing that they were fully familiar with the pipeline, they monitored the sales reps, progress, they called it ramping, which was the process from when you hire a sales rep to where you get the sales rep up and going. In fact, in one of the earnings calls, it was Mr. Budge, I believe, who talked about, well, we know what a sales rep is going to be, where they're going to be at at three months, where they're going to be at at six months, where they're going to be at at nine months. And so they talked about the metrics. So sort of turning back, in part because there are a lot of different issues raised, what I would like to do is concentrate on the main misrepresentations and omissions and CNDR, which I will add, CNDR is not an element of the 33 Act claims, the Securities Act claims. All we have to do with respect to that Act is establish one misrepresentation or omission, misleading statement that was material, that was made in the offering materials. Well, you have 18 statements, I think, Lizzie, and it seemed to me that you conceded that statement three was not false, that two and four were vague statements of corporate optimism. What is the true actionable statement? Is that statement one, the first part of it? Yes, Your Honor. Okay, and in that regard, those billings were up 40%, they were up 41%, they were up 48%, and they had one dip to 36%. Is that what you're claiming, is the material misrepresentation? What we are claiming, Your Honor, is that the material misrepresentation beginning in January, and by the way, one of the statements that was alleged to be, that defendants said was part of our alleged misrepresentations and omissions, it was not. If you look at very carefully our complaint, we are methodical, we laid out for contextual purposes because under the securities laws, one is supposed to look at context and look at statements in context, so we gave the whole, if you will, the paragraph, and then in the statements that followed, we pulled out the sections that were false and misleading, and in the following paragraph, we explained why the defendants either knew or recklessly disregarded these facts. So I just wanted to clarify that one point. Beginning with the misrepresentation itself in January, that misrepresentation, which the district court found false, was Mr. Budge's statement that today we have 250 sales reps. Suppose he had said we had 250 and there were only 230, is that material? I would submit that is, because... So that if you said he had 250 and you only had 245, would that be material? I would submit anything within two or three sales reps would be material, maybe five. Why is that? Do the investors have a benchmark where they would know that that kind of a difference would be significant, and where have you plugged that? So the reason it would be significant to investors is because this company, again, it was a startup, and so startups have different ways of promoting themselves, and so let me just explain the importance of billings. I think I understand what you're saying, is that the billings growth was comprised of two important data points, right? So I understand that. What I'm trying to understand is why that number would have been significant to investors, as Judge Kelly was asking, with respect to this sort of distinction, if they had no benchmark. Did they have a benchmark and did you plead that? So what... Do they have a benchmark? What the company did is the company over time would say how many sales reps they had, and in order to maintain the sustained billings growth of 40% or more per quarter, the way they were growing the company, they had to have more accounting plan, to your point, that look, they said our goal, and this part is not actionable, our goal is in order to keep reporting, and think about it, 40% or more billings growth a quarter is huge, and so investors are looking to that. In order to attain this, we have a plan to grow to 300 sales reps. We're going to go from... That's a goal. That's not actionable. That is not actionable, correct. There's nothing wrong with saying our goal, here's our plan, we want to grow to 300 reps. I still have a real problem with the fact that if they had one sales rep, and the sales were going up 40, 41, 48, 36, and nobody was misled that the company was losing lots of disclosures, and so it's just a question of whether the exact number of sales reps, is that material? It is material, with all due respect. But you haven't shown me, anyway, that 48% is not a good increase, and whether you have six reps, or 200 reps. Well, the reason, if I may sort of go at it this way, they had been reporting quarterly sales growth of 40% or more, and what they were not able to achieve in the second, and the company was very blunt about this. They said, look, in July, on July 31st, 2019, they went from, and we built this into our model, our model is 40 to 50% billings growth every quarter. The reason we fell so far short in the second quarter, with billings, is because we didn't have the sales reps that we said to you we were going to have. So they went to 36% increase in that second quarter, instead of 41%. Actually Your Honor, in the second quarter, they went to 27% of business to business billings, and the total billings was 23%. So that was a huge drop, and the market, when the market heard this, the market went wild. Stock doesn't just drop 39% in one day. Counsel, so don't you have to plausibly allege that in, that at the time that the statement about the quota bearing sales reps was made, that Mr. Sconard and Mr. Budge had to have the requisite state of mind as to the sales capacity gap, right? Isn't that the critical element? Why couldn't it be just as plausible that they believed that they would be just as productive with fewer sales reps, and hit their billings, and productivity is one of the components of the billings model, isn't that right? Well, Your Honor, first of all, in terms of center and plausibility, and the inferences. Under telebs, it's a balancing of the inferences. And if the inference from our facts are at least in equipose to the defendant's contrary inference, then the tie goes to the plaintiffs. And in terms of a motion to dismiss, the allegations are to be construed in a light, most favorable to us. That's sort of in terms of disconcerting. So are you contending that there's a tie? No, Your Honor, I actually, I think we have very strong center, and we have very strong center because of the admissions the company made, from a plausibility standpoint. And the admissions are the July statements. The July statements, as well as the statements in January 2020, that's number one. Number two, we also have insider trades, and so you have motive. Well, part of those trades were pre-set and pre-filed. Actually not all of them were pursued to the plan, and a lot of them, and about $18 million worth of trades, took place in a secondary public offering. During the period that you had Sconard and Budge talking about the company making the money, how well the sales force was doing, how well everything was going along, and saying that they had this incredible large sales force that's killing it, when they know they are dozens of representatives short, they don't have 250, which they told everyone. They had 200. So they know that there's going to be a shortfall, and if you look at the timing of their sales, when they took place, there's... Counselor, you're out of time. I see that I'm out of time, so would you like me to finish my sentence? I think we're all right. Okay. Thank you. Okay. Mr. Watts? May it please the Court. Today, I'd like to make a few general observations to start with, and then respond to your Honor's questions. Observation number one. Defendants have been sued over a disappointing reported business metric, billings, for which defendants did not provide a forecast and plaintiffs did not allege was false. For the second quarter of 2019, Pluralsight reported billings growth of 23 percent compared to the same quarter the prior year. Nonetheless, this was viewed as a disappointment by the market because the company had achieved 40 percent billings growth in each of the prior eight quarters. Mr. Watts, tell me what was wrong with the district court's analysis that led that court to determine that statement one was actionable. That is, it was a misrepresentation and it was material. What was wrong with the district court's analysis? Respectfully to Judge Parrish, I think she got one thing wrong, which was the use of the word about, which I think Judge Kelly was mentioning a moment ago in his questions to my adversary. In the January 2019 statement, Mr. Budge said we have about 250 records. We know in January, the first of January, how many reps there were, don't we? We don't know. It's not in the record. Is it alleged that it was something like a 25 percent overstatement that Budge made? Plaintiffs say that, but it's a conclusory and they have no basis for it. So, again, Mr. Budge said, in hindsight, this is back now in July of 2019, this is after the second quarter and into the next quarter. He said, in hindsight, looking at what happened in the second quarter, they didn't have enough sales reps to, as he said, soak up the revenue for the second quarter. It didn't mean that he knew in January. It's clear that Budge and Stoddard, is that a name? Yes. They are looking at this material all the time and they know exactly how many reps they have. That is not clear from the record, Your Honor. Wait a minute. All the statements deal with the reps they have and how effective they are. Are you telling me they are saying that and they don't know how many they have? Well, so, the problem I have is that it's not clear from the record when Mr. Budge says we have about 250 reps, what he meant. Did he mean they were hired but not fully ramped? Did he mean they were hired and somewhere within their ramping cycle? Did he mean they were hired but not yet employed by the company? So, you're contending that the number of reps is not objectively verifiable, or quota-bearing reps? No. I think the number of reps is objectively verifiable, yes. I do. And so he knew. He knew how many reps they had. One could presume that he knew. We don't know that he knew. Wait a minute. Yeah. Okay. Presume sounds different than inference. It is clear that they are chattering about this concept continuously during the class period, isn't it? It is true they discuss sales headcount during the class period, yes. All right. Go ahead. Okay. Thank you. So, plaintiffs allege that entering 2019, in hindsight, the company admitted in July, they now learned they were behind in the number of reps they needed to achieve the revenue for the second quarter. However, the allegement statement was made in mid-January, 16 days into the year. It is certainly possible that during those 16 days, additional reps were brought on, and therefore the phrase, about 250, was true when made by Mr. Budge, but would not have been true on January the 1st. So that means they fired a bunch of reps between the time he made that statement and July 29th? No, the opposite. They would have hired a few reps between January 1, 2019 and January 16, 2019. And meaning they hadn't ramped up yet? That would be true for those reps, yes. So getting back to my observations, Your Honor. So on, you know, plaintiffs admit that the most important metric for the company is billings growth. And as Judge Kelley mentioned a moment ago, the plaintiffs allege that as they entered 2019, that the billings, that the sales representatives were not there with the need to soak up the revenue in the second quarter. Now, plaintiffs, you know, point to, they say that the sales force headcount was a proxy for billings, and that should have told Mr. Sconard and Mr. Budge that they were doomed to not get that billings growth revenue in the second quarter of 2019. However, the record shows that billings growth, despite that deficit, the plaintiffs allege, they achieved that metric in both the fourth quarter of 2018 and the first quarter of 2019. But why isn't the sales capacity gap itself important to investors to know if Pluralsight had explained repeatedly that billings growth is a measure of sales capacity and productivity? If you knew that the sales capacity numbers were declining, how is that not material to investors to know? It's because the other half that equation was making up the difference, which was the salesperson productivity. So did Pluralsight disclose that in other points that you actually don't need both, you just need productivity? So it's OK if the sales capacity is declining? Well, Mr. Budge certainly said that, that his optimism was justified. So, for example, at the joint appendix 87 and 422, he said, in hindsight, he said, quote, we were still hitting our numbers. We felt like we had things broke right. We were still realizing what we needed on our retention rates. We were seeing kind of an accelerated productivity out of our reps. And he's saying that when? He's saying that in July of 2019. So, in other words, from 1st of January 2019 until July 29, their constant monitoring of this is the number of reps and their productivity, which is rosy. And it's just, oh, my God, 29th of July, it just tanked. Isn't that a reasonable view that these people just suddenly came up with this, even though they've been monitoring all the time? So you mentioned a couple of times, Judge Murphy, that they were constantly monitoring. We don't know. For example, plaintiffs allege there was a hiring plan. All we know about that hiring plan was they had a goal to achieve 300 reps by the end of 2019. And you have the CEO and the CFO who are talking about numbers of reps and their productivity continuously during the class period. And are you telling me that they were making these statements and they were putting them in their securities filings without monitoring it? No, I'm saying they may not have known all the details. For example, they may not know where they were in the rant plan in particular. Why wouldn't they know? I mean, isn't it a reasonable inference? These people are talking about it all the time. They're responding to analysts' questions about it, that they are on top of it. I mean, it's the CEO and the CFO. Correct. And they should be on top of all this. And then just suddenly, on the 29th of July, they discovered, oh, my gosh, we were wrong. So should have is not securities fraud. Should have may be negligence. It may be even gross negligence. Maybe business mismanagement. So at least on the act that doesn't require cyanter, you're conceding that it may have been adequate, the pleading. You mean falsity? Conceding falsity? Negligence. I'm conceding it may have been negligent for them not to do a better job in trying to figure out where they were. And that means that the representations they were made were negligently made. That is certainly, yes, you could draw that conclusion. So why isn't that a sufficient allegation under the, not the Exchange Act, the Securities Act claims? So to plead a strong inference of cyanter, Your Honor, they must show a strong... I'm not talking about cyanter, I'm talking about the Securities Act claims, not the Exchange Act. Oh, so the statement you're referencing, the 250, was not made in the offering documents. It was made in January of 2019. The Securities Act only covers those statements made in the March 2019 offering documents. And nowhere in those offering documents did the defendants say there were 250 sales reps. And it doesn't cover anything that the CFO and the CEO said. No, in fact, if I can point, Your Honor, to the actual statements in the secondary public offering. I understand that. We read your brief. We know what you're saying. Yeah, so those statements we show, they were very sort of general statements about a general size of the sales organization and some risk factors. And those do not put in play the 250 number that you've mentioned, Your Honor. So you're sticking with your story that the CEO and the CFO are not effectively saying that they are monitoring things when they're talking about this all the time. There's a number of reps and their productivity from the 1st of January to the 29th of July. No, I would concede, Your Honor, that at some level they're doing both. But what the numbers were telling them in the first quarter, in January of 2019, and also through up into May 1st of 2019, the last alleged misstatement, is they thought that the combination of those two variables, sales force headcount and salesperson productivity, equated to a billings growth rate that would continue from the 1st quarter to the 2nd quarter of over 40%. And suddenly, on the end of July, they said, oh, we were wrong. No, I think at the end of July, which was the month after the end of the 2nd quarter, they did a postmortem to determine what happened in the 2nd quarter. How could we have been wrong? Because we thought we saw this great productivity in the 1st quarter. That productivity did not continue in the 2nd quarter. Therefore, we were caught with fewer sales reps needed to soak up the sales that were out there. So they did a postmortem. And what plaintiffs characterized as an admission was not an admission. It was merely them telling the market in their language, Mr. Budge and Sconard said, here is what we have learned from the 2nd quarter, not what we knew all along. Is it that they didn't know that there was a sales capacity gap in January of 2019, or that they didn't think it mattered? Which one is it? That it didn't matter. And that is that they had sufficient productivity from their sales reps to still achieve their billings growth percentages. I just don't understand how that number, the sales capacity number, wouldn't matter to investors if Pluralsight sold itself as the billings growth is comprised of two data points. Because the materiality is one where you have to combine the two to determine if you can achieve your billings growth. And they did. They did in the 4th quarter. And they did in the 1st quarter. Say that again? Materiality is what? They must have known at the time in January that the failure to getting the sales force headcount number incorrect would mean they would not achieve their billings growth rate. And that is not in the record. In fact, it's clear they had justified optimism to believe that their 1st quarter results would continue into the 2nd quarter because of the results. Can I ask you about Cyanter and these automatic trades on 10B5-1? The suggestion is that there were many, many shares and lots of money traded by the two individuals to meet tax liability. That's kind of an overstatement. Wasn't it the company that did those automatic trades rather than the individuals? There were there were there were two types of predetermined trades made during the class period. Type 1 was a 10B5-1 trading plan. That's where they... I understand all that. I'm talking about the tax liability. The second is... That was generally done by the corporation. Yeah, correct. Not the individuals. No, predetermined, not the individuals. It was automatic. When they vested a share, the company would sell the share to cover the tax liability. So the one individual... There were automatic trades in September and the other one, I think, in December. So the latter just barely a month before the class period, correct? So, yeah, there were trades. So at the time they are making these statements and at the time the securities filing is being made, they know that if the stock price is ramped up, is that the automatic trades will kick in and they'll do very well, right? They were certainly aware during the class period of their predetermined sales and their 10B5-1 trading plan. And the higher the stock, the better off they're going to do when these automatic trades kick in. That is also true, Your Honor. Now, one thing to note here is that under those 10B5-1 trading plans, the allegation is that they somehow juiced or inflated the company's stock. But those trades, of course, throughout the entirety of the class period, the bulk of the trades, however, were in that secondary public offering. And that offering went out in March of 2019. That is a month before the end of the first quarter. They didn't disclose the inflationary, plaintiff's alleged inflationary disclosure until May of 2019. So they basically sold too early if their goal was to maximize the profit. You're out of time, Counselor. Thank you. Anything further, Judge Kelly? No, thank you. Thank you, Counsel. Case is submitted. Thank you.